Good morning, your honors, and may it please the court. On January 22nd, 2010, Iraq War veteran Gregory Kitchen died in custody at the Dallas County Jail. The evidence in the record shows that Mr. Kitchen was suffering from mental illness and that during a psychosis, the defendant guards burst into his cell without consulting the jail's medical or mental health personnel. The guards then pepper sprayed him and restrained him on the ground face down. Mr. Kitchen became unresponsive and died. On autopsy, the medical examiner determined that Mr. Kitchen's death was caused by restraint asphyxia and that the manner of death was homicide. The district court erroneously granted summary judgment to the defendants, and today we urge this court to reverse and remand for trial. I will begin this morning by addressing plaintiff's excessive force claims and explaining that there are genuine issues of material fact precluding summary judgment on those claims. I will then turn to the denial of medical care claims and explain that granting summary judgment on those claims was also improper. Unless the court has questions, we will stand on our brief with respect to the municipal liability issues. Turning first to the excessive force claims, a reasonable jury could conclude that the defendant guards maliciously and sadistically used force against Mr. Kitchen. Let me ask you this. He was beating his head against the bars, and they had some earlier indication that he was suicidal. Why did that not create an emergency situation, at least to a reasonable guard, to go in and do something about it immediately? Well, Judge Davis, the question of whether he was beating his head against the cell is a disputed issue of fact. In the record, there is the affidavit of Joseph Daniels who testified that Mr. Kitchen was, in fact, hitting the cell wall with his fist. He's one of the inmates, and not his head. But in any event, even assuming is true that he was hitting his head against the cell, there is a genuine issue of material fact as to why the defendants performed this forcible cell extraction. Is there also an issue of fact regarding Officer Haggerty's deposition testimony that any headbanging had ceased? That's correct, Your Honor. It is actually uncontroverted that the headbanging had ceased at the time. So there's not a fact issue, but that's just a fact that you would say is good for you? Is that what you're saying? Yes, Your Honor. But even the question of whether he was banging his head at all is in fact, uncontroverted in this case, that any alleged headbanging had ceased by the time the defendants decided to perform this forcible cell extraction. In fact, Defendant Guzman testified at deposition that it was only when Mr. Kitchen showed his middle finger to the guards that they decided that they then needed to extract Mr. Kitchen. So one could reasonably infer that the true reason the defendants entered Mr. Kitchen's cell was to retaliate against him for the middle finger. In the defendant's brief, they claim that this is impossible. One cannot draw this inference because, according to them, Sergeant Myers, who gave the order to enter the cell, wasn't present for the middle finger incident. But on page 57 of his deposition, which is in the record, he admits that he did in fact see the middle finger being shown. So that is, when defendants claim he didn't see that, that's simply factually incorrect. There's no doubt that he hadn't calmed down and settled down, though, had he? I mean, in other words, even though he may have momentarily quit hitting the bars, he was still thrashing around and very upset and wouldn't be calmed down. Isn't that right? That's correct, Your Honor. There is no dispute that Mr. Kitchen was experiencing a mental crisis at the time that this occurred, and the guards in Guzman and Defendant Myers actually said to Mr. Kitchen, calm down, we'll get psyched for you, we'll take care of you. But the evidence is they never contacted or never sought any psychiatric care for Mr. Kitchen. Instead, when he showed them his middle finger, they ordered this forcible cell extraction. I mean, the time frame here is pretty tight, isn't it? I mean, it's like six or seven minutes, this whole thing transpired. That's correct, Your Honor, and the Mr. Ahmed, who was one of the jail's leading site staff, was just down the hallway and about a minute away, but the defendants did not contact him or did not seek any other aid for Mr. Kitchen, who was obviously deeply disturbed and who they knew had had mental issues. It was not merely that he was suicidal. In fact, the indications for him being placed on suicide watch is rambling incoherent statements he had about wanting to kill himself by flying 500 miles an hour in a plane. It was obvious to all that this was a deeply disturbed individual. Can we consider the inmate's statements, or are they inadmissible, and was an objection made to them at district court? Are we allowed to consider those in making our determination? We would submit that the court must consider those in making that determination, Your Honor, because there was never a motion to strike those affidavits, so any argument concerning the admissibility of those affidavits has been waived. Certainly one could argue about the weight to be given to the various accounts that are contained within this fact-intensive record, but that is, of course, not something that the court can decide on summary judgment. That's something for the fact-finder to decide. Those statements by the prisoners seem to be your best evidence, at least as to what happened after he was restrained. These prisoners are saying there was some more spraying, some more stomping on him. The problem I have with those, though, is it doesn't identify which officers, and so at the end of the day, if you were to get this case back to the trial court, you'd need to get a jury instruction on each defendant. How can those prisoner statements get you to liability on a particular defendant? Well, those prisoners haven't been deposed, so we don't know exactly whether they could make in-court identifications of particular officers or not. That would have to, that would ultimately have to play out at trial, but what's interesting about this case is the medical examiner's findings cannot be squared with the defendant's account of the force they used. According to the defendants, when they entered Mr. Kitchen's cell, his back was to them, he turned around, and then they tackled him to the ground using a neck-controlled takedown. They pepper sprayed him, he kicked towards the guards, they then, and he was on his back, he then, they then pepper sprayed him again, and then he actually was compliant. He rolled onto his stomach, allowing them to, to handcuff him, and they claim that once they handcuffed him, they immediately ceased all use of force. But the medical examiner found evidence of hemorrhaging to Mr. Kitchen's sternothyroid and sternohyoid muscles. The medical examiner found areas of tichial hemorrhaging in the laryngeal mucosa. The medical examiner also found areas of focal bruising on Mr. Kitchen's back. So, those findings are irreconcilable with the defendant's account that they merely handcuffed him and that was it. Those findings, especially the bruising on the back, is consistent with applying pressure after Mr. Kitchen is handcuffed. So, a reasonable jury in evaluating that conflicting evidence could disbelieve the defendant's accounts and could hold them liable, either directly or in a bystander liability theory. To give an example, if Mr. Kitchen had been shot by one of the defendant guards, but all of them denied shooting him, that would not mean that they were all entitled to summary judgment. It would... Well, but didn't the officers admit that one of them had, had his knee in his back after he was down? There's, there are different accounts about that. The officers have testified that it is permissible under Dallas County's policies to, to place a knee in the back, but many of the defendants testified at deposition, including defendant Guzman, that they did not, in fact, place a knee in his back and they did not exert any pressure on his neck, which is, again, contrary to the medical examiner's physical findings. And their accounts cannot be squared with the And there are genuine issues of material fact here as to the defendant's motives with performing this forcible cell extraction, as to whether Mr. Kitchen was banging his head on the cell or whether he was using his fist against the cell. It's undisputed that the, the, the head banging had stopped at the time they decided to enter the cell, but it was in fact precipitated by the, the middle finger incident. There are also genuine issues of material factors to the force that was used, created both by the inmate affidavits directly and also circumstantially, and, and I submit powerful circumstantial evidence from the medical examiner in terms of those physical findings. Even if you were able to create a fact issue under the Hudson factors, is there still the issue of qualified immunity? The district judge in this case didn't reach the issue of, of qualified immunity. But we could as an alternative ground, couldn't we? That's correct, your honor. In, in our view, qualified immunity is of no help to these defendants because Mr. Kitchen's right to be free from malicious and sadistic uses of force is clearly established. This is not a, a fourth amendment case where the touchstone is reasonableness and, and different people could disagree on what is reasonable under specific facts. The, the right of pretrial, pretrial detainees to be free from malicious and sadistic uses of force is, is clearly established. So, so long as there is a fact issue as to whether the defendant guards sadistically and maliciously used force against Mr. Kitchen, they are not entitled to qualified immunity because if the jury, in fact, reaches that factual conclusion, then there is no basis for finding, a finding of qualified immunity. So we do not believe that, that qualified immunity provides any basis for affirmance here. If there are no further questions regarding the excessive force claims, I would turn to the denial of medical care claims. It is, it is settled, your honors, that when a detention officer consciously disregards a detainee's serious medical or mental health need, that detention officer violates the constitution. In this case, the testimony was from Defendant Guzman and Defendant Myers. They told Mr. Kitchen, we will get psych for you. They recognized that there was a mental crisis that he was experiencing. They told him they would get psych and they admitted in their depositions they did absolutely nothing. A reasonable jury, hearing those facts, could easily conclude deliberate indifference. That is the classic example of deliberate indifference, where one recognizes a need and then fails to act upon that need. Well, you know, the time frame operates against you on this, it seems to me. I mean, you've got a seven or eight minute time frame here. You've got a, the inmate had grabbed a nurse and threatened medical personnel earlier. I mean, why wasn't it reasonable for the officers to get him under control before they tried to get medical help to him? Well, in terms of the, in terms of the assault on the nurse that happened, I believe, a day earlier. So I don't think that played into their determination. Certainly there's no... I mean, you know, that gave them pause about taking him to the, down to the nursing station. That's true, Your Honor, but our point about that is that they didn't even summon any medical or mental health staff to even look at him outside the cell. There was a food tray medication could have been dispensed through the food tray. The, the, the whole purpose of involving medical and mental health personnel is to calm an inmate who's experiencing a mental crisis. That's why they, that's why they're there in the jail, not merely to write prescriptions but, but to assist in the inmate's health and safety. And so there was this opportunity to, to summon medical care. Dr. Ahmed was less than a minute away. A psychiatric nurse was in fact being called for a neighboring inmate. So there's no reason that she couldn't have evaluated Mr. Kitchen. And the short time frame of seven to eight minutes is a function of the defendant's deciding to, to enter Mr. Kitchen's cell. Again, it is undisputed that the headbanging at, at that point had ceased. So we submit that a reasonable fact finder could conclude that by failing to assess Mr. Kitchen's medical needs, would deliberately indifferent to Mr. Kitchen's medical needs. The, the. I have a question about the Monell claim. Is there a fact issue about Dallas County's policies concerning non-emergent cell extraction of mentally ill detainees? Captain Rose says that they are required to consult first. Jeopardy Herrera, or whatever his title is, testified that they, that they can do it without any consultation. What is the policy of Dallas County, and did that play a role? Was that a moving force behind the excessive force, alleged excessive force? We, we would submit that there is a practice shown by defendant, sorry, Officer Herrera's testimony that they don't have to do it, and then Captain Rose saying they do in fact have to do it. Additionally, their policy, they, they train mental health transfer officers because they are experiencing mental crisis, this is a volatile situation, and special training is necessary. They could have brought in someone they already had on staff who deals with mentally ill people being transferred? That's correct. Or, or any of the psychiatric staff who are involved in, in these type of situations. So we do submit that a fact finder based on that could find that the, the practice of performing, I see my time has expired. Is the psychiatric staff the same group of people that, where the nurse was attacked, or is that a totally different staff? I believe that is a different staff, Your Honor. Thank you very much. You have some time left for rebuttal. Thank you, Your Honors. Okay, Ms. Westergaard. May it please the Court, Counsel, I'm going to address first the issue of the county liability. First for excessive force, I point out that even if you find that these officers did commit a constitutional violation, there's nothing in the record that indicates that that was due to a county policy. And I want to specify, when I talk about a policy, I'm not just talking about . . . it's not enough to just establish a policy to violate Section 1983, impose liability on Section 93. You've also got to establish that it's moving force, as Judge Elrod mentioned, but also and most importantly, you've got to show that they knew about the policy and that it had already caused constitutional violations. That's very well established. It's got to establish a pattern of constitutional violations before there's deliberate indifference. There's no evidence of that related to excessive force. Likewise with the denial of medical care. They list out four things, policies that they say are unconstitutional. I don't know how a policy can be unconstitutional the way they've phrased it, but there's no evidence of a deliberate indifference. In other words, the way that they had conducted themselves regarding the policy of consulting before you pull somebody out of a site, before you pull somebody out of a tank, that that policy had already caused constitutional violations. Was the policy that you were supposed to consult and the officers didn't follow the policy, or is Officer Herrera correct and the policy is that you don't have to consult? I believe it is conflicting in the record, but I believe it's more likely that it's discretionary. It's not a written policy, it's a practice, which puts us back under the, okay, so it's discretionary, whereas the evidence that this practice has already caused constitutional violations and the sheriff should have changed it. Why isn't there a fact issue between Captain Rowe and Officer Herrera? It's a meaningless ... Okay, except Herrera, that it's discretionary. We'll take that. That's the worst one. Favors the plaintiff. Nonetheless, the question ... That's just the first question in determining Section 1983 liability. For the other people's liability, it actually goes the other way. If they violated the policy, then those officers could be liable, right? Then we wouldn't have the Monell for the ... That might have a bearing on the officers themselves. A violation of policy, it might. It cuts either way. One gets the county out and one puts the officers, perhaps, on the hook. Violation of a policy, but the question is whether you violate the Constitution, not a policy for the individuals. That's why it doesn't matter. As far as the denial of medical care came apart, it was Captain Rowe who made the decision to move him to the West North Tower. It was only Sergeant Myers who made the decision not to consult psychiatric care before getting him out of his tank. Now, they keep saying, well, they could have called Dr. Ahmed. They didn't. In fact, the evidence from Dr. Ahmed is that he was already in his office looking up this individual to find out what medication had already been prescribed for it. It's in Dr. Ahmed's. He already knew about it. Because it was, as you say, fast moving, but there had been a call over the intercom about the situation, so he was already aware of it. Is there anything in the record as to why they didn't bring in the special mental health people that could remove people with special precautions? No, there isn't. I don't know that there was necessarily anybody that was available at that time, and the question is get him out now. Why is that? Because this was, according to the plaintiffs, non-emergent. This was not an emergency at that time. Well, that's the judgment call that Sergeant Myers gets to make when he's on the scene, and he sees this man. He said he saw him hit his head. Somebody else said he only saw him using his fist, hitting the wall with his fist, but it's what Officer Myers, Sergeant Myers saw and said, I saw him hitting his head repeatedly. Did he have any injuries to the head on autopsy? I think there was some damage to the face. I'm not sure about the side of the face, but we didn't know that. If there isn't any, we just know that this man is hurting himself. He's done it before, and he's done it in the presence of officers. He's suicidal. He's in a drape. In other words, he's on suicide precautions. Now, they say, wait, wait, don't do anything. Well, he might have already out-hundreded himself in hitting his head against the wall, and it was very apparent that he needed some kind of assistance. Had they had an earlier occasion where he hit his head on the bars? Yes, over in the West Tower. He had hit himself on the bar by the door. How long before? No, that was quite some time before. How long had he been in the jail? He came in on the 16th. The head-banging was earlier in the morning, I think, the day before when he assaulted the nurse. It was like at midnight he assaulted the nurse. And then he was moved, and the head-banging continued. What you have is shift change. Officer Guzman here is a call for help. Because there's a guy named Etheridge who's trying to kill himself on the same floor. So he goes back to address that. And then he sees, while he's doing that, he sees Kitchen banging his head against the wall. He says, stop, I'll get you help in a minute, and I'll be back. And that's when Kitchen gave him the finger. Then there's a time break, because Guzman leaves, is what the record shows. He leaves and goes over to take care of Etheridge and comes back. And at that point, it is Sergeant Myers who makes the decision, this guy needs help, we need to get him out. Why do you need to get him out? We need to get him out so that medical personnel cannot go into the cell. No matter who they are, that's in the record. They can't go in the cell. So you have to get him out to get him medical care. So they complained because we didn't get him medical care, but we were trying to get him out to get him medical care. Well, of course, the argument is if you'd had a trained psychologist, he could have calmed him down standing outside the cell. If there'd been any evidence of that, that's just an assumption that he could have used magic words. And I think that goes back to the officers. They've been specially trained in how to handle these kind of extractions. It was a strategic response team, and they took seven or eight minutes. And all they did was say, please sit down, lie on the ground, lie on the ground, easy to understand instructions. I don't know, there's this theory that psychiatrists could have come in with magic words and calmed him down, and there would have been no problem. But the issue is we still have to get him out of his cell. I'm sorry, I'm confused. Was this the strategic team for mentally ill people? No, no, no, I don't mean, no. You're saying they were a strategic team. There was another team of specially trained people for mentally ill people to extract them, right? Extract them, mostly to transfer them. Transfer, but that's the same. To transfer, you have to use the same skill to get somebody out of the cell. Yes, although for the more serious offenses, serious inmates who are more serious, harder to control. That's what the strategic response team is for. Do you believe that we can consider the inmate's statements? Yes. We can consider them. Yes, I did not object to them. Okay, thank you. And I want to talk about those, because one of them, well, there's four of them. One of them confirms the officer's position. He says, I didn't see much, I didn't see what was going on in the cell, and nobody saw what was going on in the cell. And there's no question that when he was in the cell, he was struggling. He's a huge man, there's a little variation in the record about his weight. Between 350, I think the autopsy puts it at much less, but close to 300, struggling and psychotic. They ask him to turn around, he turns around and begins to attack them. At that point, they have already restrained themselves by waiting, trying to talk to him, and they've tempered their response. It's not until he responds that they respond, when he resists, that they respond. That's when a use of force is appropriate. And it's not excessive if it's in relationship to the need for the force and the tempering of the response. It wasn't, doesn't one of the prisoners, this Joseph Daniels, I mean, he talks about conduct after they've subdued him. Yes. I understand there won't be an immediate cessation, it's a heated moment. But multiple additional sprays stomping on him, and whether this is true or not, obviously we have to accept it is right now. Why doesn't that post-handcuffing conduct at least create a fact issue? Well, there's a case that I cited in the brief where you can still spray someone after they're been handcuffed, because they can still be resisting you with different parts of their body. But at most, they say there were two more sprays than our officers say occurred. The question is, does that necessarily make it excessive? That they used two more than is necessary. I mean, two more than they said they did not. No evidence, there's no evidence for us to say that's excessive. But you know, more than spraying though, at least one of the statements said they stomped him and hit him repeatedly. So why doesn't that create a question of fact? Because I think that's part of the immediacy of that situation, where the use of force doesn't necessarily stop because the inmate doesn't stop resisting. And he continues to resist. And they said he, there's also mention about stumbling by the officers in that course. The question then is, is that excessive? It doesn't play any role in his death, because his death was caused by things that are outside of our control except for the mace. That is, he was laying on his stomach, he was overweight, morbidly obese. The psychological stress of his psychosis, and then an enlarged heart. What about the knee in the back? Isn't that, that's linked to where this, these types of positional fixation type things. There's not in this record. No one, no expert has tied that knee in the back to. But you're aware that there's many cases where they tie that knee in the back to those fixations. There may be cases, but the question is that there's no evidence here. The autopsy didn't find that played any role in his death. They didn't say it didn't play a role, did they? Pardon? Did they say it did not play a role? I don't, I'm not going to represent that judge. I don't know that. I don't think that's correct. They didn't say that. I would also like to address an issue that you brought, Judge Costa, about the individuals. because they're all lumped together. There's ten of them. I represent ten individual officers who have qualified immunity, which means they shouldn't go to trial unless things are clearly, that each one of them did something wrong. You can't, at this point, we don't even know who, who did, who did wrong? Who did the stomping? Who did the kicking? We shouldn't be waiting now until trial time to find that out. That should have already been established. Then they say, well, we could have taken depositions. Yes, they could have and they should have. Because you can't set, put these people to trial without them knowing what it is they do wrong. Did you oppose discovery from the officers in any way? No, what happened is, no, they, before they named the officers, they took all their depositions and then immediately thereafter named them all. So they, if they, oh, they deposed all the officers. So they deposed every one of them and they could find out who was the stomper or whatever. They could have. But they didn't, they didn't depose the inmates. They didn't impose the, didn't depose the inmates to find out who was. So we've got ten people who are all supposed to go to trial because plaintiffs still haven't figured out who it was that did what is alleged to have occurred by the inmates. And you can't just say it's bypass or liability because, like, you were there. So you're responsible because you've got to show that some, they knew he was going to, he or she was going to do that. Could have taken some opportunity to stop it, and didn't. And we're talking about something that occurred in a few seconds, because this whole scenario came down so quickly. There's nothing that fits the bystander liability in there. It's also that there's, these officers are entitled to qualified immunity, which you may or may not address. You may remand to the court. You may address it now and say, you can't force these people to go to trial on so little specificity. I think that since the district court didn't address it, you think, and it's kind of confusing with all the various officers, that we should remand to the district court if we, on that? Yes. On qualified immunity, I mean, apart from this issue of which specific defendant you can tie the conduct to. I mean, it's clearly established that you can't use malicious conduct, so it seems hard to me if there is. There's a case in my brief, Judge, and I forget which one it is. It says, even if it's malicious conduct, the question is whether it's objectively unreasonable under the circumstances. Would all public officials in their circumstances condemn what they did? That's the question. And I think under that test, whoever is alleged to accepting the truth of the inmate's affidavit, whoever is alleged to have done that, still malicious, sadistic, I don't know, mean, maybe, unnecessary. But it doesn't mean that all officers would condemn the person for that. And who are we condemning? We don't know. So- If they're stomping on his back, if they're spraying him after he's subdued, if we were to find that creates a fact issue on excessive force, I just don't see how then that's not clearly established to be a violation of- Well, it's not a question of it being clearly established. We don't look at it in the generality that they talk about. Plaintiffs talk about the right to not be used as opposed to excessive force as well established. Supreme Court warned in Ashcroft, basically quit it. We're talking about that level of generality. Talk about the specifics of the case, like, that it's, what would have told these officers that you can't spray more than twice? You can't spray someone with mace more than twice or you violate the law. What if, the question is, what would tell the officers, once the person is already subdued, that you shouldn't kick them and repeatedly spray them after they're subdued? That's the, if we take the light, the facts in the light most favorable to the plaintiff. And we've been counseled on that by the Supreme Court recently, about taking facts in the light most favorable to the Supreme Court in these qualified immunity cases. So, would every officer know, I'm giving you the fullest benefit, that you're not, after somebody's already subdued, you're not supposed to keep kicking them and pepper spraying them? I don't know that the two affidavits, and I'm not going to miss, the two affidavits of the two inmates who say he was kicked off, say that he was subdued. I don't know that they say that. The affidavits are in the record, I think. If they do say they subdued, do you have a tough row to hoe? But who is it? Yes. But who is it? We're back to that. But were these guards regular on that tire? No, this was a special team brought to this, just to extract this individual. The SRT team, Special Response, Strategic Response Team. So would the inmates have known them by being able to identify them? They might have, because they also work around, but they were not assigned to that floor, so that would not. They were around a fair amount on that floor? I'm not going to say, Judge, that we don't want to misrepresent the record. I just know that this was a group of individuals who are, some of them have been there for decades. Jonathan Bruce Reed, and I think these courts dealt with him before, and Buffalo Chambers. And so they probably know everybody in the jail. Was this a floor where most of the inmates were temporary, or had they been there a long time? Several of them had been there a long time, but it was a protective administrative custody situation, because they had posed such a threat to the nurses where he'd been previously located. But now he's in the North Tower, where Dr. Ahmed is just a few, I think Dr. Ahmed says I'm 30 seconds away. And he was the head of psychiatry. He says, I'm just down the hall, and I knew about this as it was happening. And so, and I was even looking up for medication for him to determine what he needed, if there was something that I could give him. And so he was in the right place for what he needed. He was on suicide precaution, so it doesn't matter where he was placed, because he's in a single cell with a vapor drape, that's where he's going to be no matter what. And the services are just down the hall. But that he's near somebody else that's having a breakdown or whatever. Is this the sort of thing that the DOJ has criticized the Dallas County Jail for, how they're housing the mentally ill inmates, that's in the, there's a briefing about that. The fact that if he's right next to someone else who's having an attack, and he's hearing that, and that causes him to get- No, I know that DOJ, I've paid for that DOJ report, and a couple of losses in this court. And this Department of Justice doesn't address anything related to this situation. I can remember, it predates this case by at least five years. So it's perfectly fine to put these mentally ill people- No, no, no, no. No, it's not mentally ill, it's that the other guy was trying to kill himself and we don't know why. But you could, Pete, but you agree that y'all knew that the plaintiff here was mentally ill, the decedent here was mentally ill. He had some mental issue, yes, there's no question. I don't know about- And they do that ahead of time, and it's okay to put him in the North Tower even if he's mentally ill. Well, because he's committed, he's been moved at the decision of Captain Rowe, none of the defendants in this case, because he will not let him stay on his floor because he's a threat to the nurses. They can't help him. So he needs to go over there to be helped where he can be handled specially, because he's committed this assault. And it wasn't just a simple assault, it actually did physical injury to the nurse. So it was something that was a legitimate movement by a non-defendant in this case. Any further questions? Thank you very much. Thank you. Okay, Mr. Kennedy, back to you. May it please the court, we have two points for rebuttal, your honors. First, there was no explanation as to how the inmate affidavits and the medical examiner's findings don't create a genuine issue of material fact on the excessive force claims. The fact of the matter is, they do create a triable issue of fact that has to be resolved. But as to which defendants, I mean, you said earlier that, well, they can ID people at trial. But I mean, on this summary judgment record, don't you have to have a fact issue on a particular defendant? Well, the problem is, your honor, all the defendants deny that they stomped, that they pepper sprayed after Mr. Kitchen was restrained. They all deny that they exerted pressure on Mr. Kitchen's neck muscles. They all deny that they put a knee in the back. What's the best case that says that when they do that, we can still send it back for trial, and it's all for one, one for all kind of thing? Well, I don't know that it's an all for one, one for all. In Section 1983 claims, there is bystander liability, and a jury could hold them liable. But evaluating a witness's credibility against opposing circumstantial and direct evidence is a classic jury function. But for bystander liability, you have to have an underlying violation, and then the people who are the bystanders. Bystanders, so who committed the underlying violation? Well, your honor, the fact of the matter is, we don't know because they all deny it. We cite to a case in our brief, Bailey versus Dallas County, in which it's a district court case, but the judge permitted the case to go forward where one of the individual guards performed a choke hold on the individual, but they all denied that it happened. To take an absurd example, or a more extreme example, if one of the defendants had shot Mr. Kitchen, and they all denied that there was any shooting, that wouldn't mean they could all get out on summary judgment. Was there some reason you couldn't depose the inmates? We didn't seek to take their depositions. We were limited to the number of depositions we had by the district court, and of course, with nine individual defendants here. We had to prioritize our discovery in terms of the witnesses that were- How many depositions were you allowed? I can't recall, Judge Elrod, as I stand here today. In terms of counsel's argument about the magic words, a reasonable fact finder could conclude that contacting mental health personnel would have made a difference. As we explain, medication could have been dispensed to Mr. Kitchen without going into his cell. Also, the fact that Dallas County has a team of mental health transfer officers, it wouldn't make sense for them to maintain such a team if nothing anyone did mattered, and if no different approach could have yielded a different result. And assessing causation is, again, a classic function of the fact finder. Unless there are further questions, we would ask this court to reverse and remand for trial. Okay, thank you, Mr. Kennedy. Thank you, Your Honors. Thank you, Counsel. We have